699 S.E.2d 730

**In re FAITH C., Sophia S. and Madelyn S.**

**No. 35452.**

Supreme Court of Appeals of
West Virginia.

Submitted March 31, 2010.

Decided June 4, 2010.

Matthew A. Victor, Esq., Victor, Victor & Helgoe, LLP, Charleston, WV, Guardian ad Litem.

Barbara Lynn Utt, Esq., Law Offices of Barbara Lynn Utt, Charleston, WV, for Appellee, Sarah S.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Kanawha County entered on July 30, 2009, which granted a six-month dispositional improvement period to the appellee and respondent below, Sarah S.[1] in this abuse and neglect proceeding. In this appeal, the guardian ad litem for the children, Faith C., Sophia S., and Madelyn S.,[2] contends that the circuit court erred by granting the improvement period and not terminating Sarah S.'s parental rights. This Court has before it the petition for appeal, the entire record, and the briefs and argument of counsel. For the reasons set forth below, the order of the circuit court is affirmed, and this case is remanded to the circuit court with directions regarding the improvement period as set forth herein.[3]

## I.

## FACTS

On September 15, 2008, the West Virginia Department of Health and Human Resources (hereinafter "DHHR") filed an abuse and neglect petition alleging that Faith, Sophia, and Madelyn were abused and/or neglected by their parents. Sarah S. is the mother of all three children. Teddy C. is the father of Faith, and Benjamin S. is the father of Sophia and Madelyn.[4] In particular, the DHHR asserted that on September 12, 2008, Sophia, who was twenty-two months old, received second-degree burns to her legs and feet as a result of an intentional immersion in scalding water at her home. The DHHR maintained that the perpetrator of the alleged abuse was Sarah S., as there was no dispute that Benjamin S. was not at the residence at the time of the incident.[5] The

only people present in the home at that time were Sophia, Madelyn, and Sarah S.[6]

As a result of her severe injuries, Sophia was first transported by helicopter to the Burn Center at Cabell Huntington Hospital in Huntington, West Virginia, and then transferred to the Nationwide Children's Hospital in Columbus, Ohio, a few days later. After prolonged treatment which included surgery, Sophia's wounds healed. Although the police responded to the residence at the time of the incident,[7] no criminal charges were filed against Sarah S. She claimed that Sophia had climbed up onto the bathroom sink, turned on the hot water, and burned herself instantaneously. Sarah S. stated that she was outside of the family residence talking on a cell phone when the incident occurred.[8] She said she heard a child screaming and did not immediately respond because she thought the screams were coming from her youngest daughter, Madelyn, who needed a nap. When she did go into the residence, she said she found Sophia on top of the bathroom vanity already severely burned.

During the abuse and neglect proceedings below, the DHHR presented testimony from two experts, Eduardo Pino, M.D., and David Henchman, M.D., both doctors at the Burn Center at Cabell Huntington Hospital. They testified that the nature of Sophia's burns indicated that she had been immersed and held down in scalding water. According to these doctors, no other explanation of the child's injuries could be consistent with the type of burns she sustained. Specifically, Drs. Pino and Henchman testified that the "glove and stocking" circumferential burns encompassing the entire area around the child's legs could only lead to the singular

---

1. We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See, e.g., In the Matter of Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

2. For ease of reading this opinion, the children will hereinafter be referred to by their first name only.

3. The final order was stayed pending this appeal.

4. Sarah S. and Benjamin S. are married.

5. Benjamin S. was working out of state and was in Tennessee when Sophia was injured.

6. Faith was at school.

7. Sarah S. called 911.

8. Sarah S. indicated that she has to use her cell phone outside because she has poor reception inside her home.

conclusion that the child had been immersed in scalding water and held down. Dr. Pino opined that this was a "classic" example of an immersion burn. During his testimony, Dr. Pino stated:

> The nature of the burns being circumferential, particularly higher or one side then [sic] on the other, really to me signifies that this child was more or less dumped into hot water.
>
> . . . .
>
> ... I don't know what the water temperature of the sink was. But the fact that both extremities are burned, nobody steps into a bathtub or sink or whatever, with both feet at the same time.
>
> The fact that it's circumferential means that it was just an immersion, just going like this. Certainly one foot versus the other is that one foot was probably picked up and so that's why it only burned to one leg, and the other one burned further down.

Similarly, Dr. Henchman testified that he could not imagine any other scenario to explain Sophia's injuries other than someone just holding her down in the water. He testified:

> I can't imagine another scenario that would give that result. I would think that anytime a child or anyone's foot touched hot water that much, instinctively pull it away. To put both feet inside up to the calf in scalding water, I can't imagine another scenario.

The DHHR also submitted into evidence a medical report from the Nationwide Children's Hospital which included the following statement from Gail E. Besner, M.D., the attending physician:

> Child Assessment Team was consulted and evaluation revealed bilateral circumferential burns to both feet extending to the mid calf on the right and to the ankle on the left (i.e. in an asymmetric stocking distribution). The mechanism of production of these burns was immersion into a scalding hot liquid. Child Assessment Team consultant indicated this pattern of burn injury was frequently inflicted. The patient also had an unexplained long linear bruise to the right thigh, which added concern for physical abuse ... Child Assessment Team agreed with the filing of a report of suspected physical abuse to Children's Services.

In contrast to the evidence presented by the DHHR, Sarah S. offered the testimony of Gregory Porter, P.A., who indicated that he had participated in approximately twenty-five water submersion cases. Mr. Porter was qualified as an expert in emergency medicine, primary health care, and emergency medicine for children. Mr. Porter opined that Sophia's injuries were accidentally self-inflicted. He testified as follows in response to questions from counsel for Sarah S.:

> Q: Is a stocking glove appearance the only thing that you look at when you are trying to determine if one has had an immersion burn or not?
>
> A: Absolutely not.
>
> Q: What is a stocking glove appearance to a burn?
>
> A: Stocking glove, I mean if you think about it, has [sic] a female wearing knee highs, that sort of thing. Stocking glove usually refers to that. It is very, you know, clear from the foot all the way up to a level. It is sort of like a stocking.
>
> . . . .
>
> Q: But would that be dispositive that it's an immersion burn or would it be a possibility?
>
> A: It rises the—raises the suspicion for immersion burn.

Mr. Porter explained that in addition to the appearance of the burn, the depth of the burn had to be considered. He stated:

> Q: Okay. Is there anything about them, the depth of an immersion burn that is important?
>
> A: Absolutely.
>
> Q: What is that?
>
> A: During my research of the case, I think that's the most striking piece of evidence. If you are immersed in a body of water that is a consistent temperature say that this child, I think the water heater was 147, 150 degrees; if you take a child and you emerge [sic] in that water, you are going to have the same depth of burn

everywhere that the water was. The only thing that would change that is the time of exposure. But so random, that you just draw a line and you stick them in the same amount of water you will have same thickness burn all the way from start to finish.

Q: Did this child have the same thickness burns?

A: No, they did not.

Q: Were her burns then mixed?

A: That's a good way to describe it, mixed depth.

Q: And if you would, talking about mixed depth, are you saying that the burns are different on her foot or top of the foot or back of her leg or what?

A: Yes. On different parts of her body are different depths.

Q: The medical records support mixed depth injuries?

A: The initial medical records did not. But in burn cases you really don't know what a burn looks like for several hours or even days after a burn. There is continued damage that goes on even after the burn. Both nerves vascularly and dermis.

A burn can look very bad initially, and as it starts to heal, the next couple of days you will see the true character of the burn.

It's worth mentioning that the burns from the mid-calf distally and spontaneously healed. It was a second degree burn that spontaneously healed. And this child unfortunately had to be grafted on the dorsal of the feet, the top of the feet.

Mr. Porter further explained that the fact that the burns on the top of Sophia's feet were deeper than her other burns was consistent with her standing in the sink, turning on the faucet, and allowing the hot water to hit the top of her feet. He testified:

So to me if the story was she was in a basin and there was hot water running from above on top of the feet, that makes perfect sense in my opinion.

Q: So there was mixed depth. And the place that had to be grafted was the top of the feet?

A: Correct.

Q: Did the bottom of the feet heal?

A: Spontaneously.

Q: Did the back of the leg heal?

A: Spontaneously.

Q: Did the front of the leg heal?

A: Yes, spontaneously.

Mr. Porter also testified that "typically in burns that are of immersion only and forced immersion, that line is very straight, it would be more cross both sides." Referencing photographs of Sophia's injuries, he stated, "This one is a very irregular line. This one is not burned up very far, and also an irregular angle." He concluded:

My opinion is an accidental burning. I think they—an adult was not around to supervise this child. I think this child, in my opinion, made it to the toilet, made it to the vanity, switched on the hot water. And then could not as the water rose—as I understand it, it's a slow draining vanity. As the water rose this child had nothing—nowhere to go. And I think she, you know, sustained the injuries that she sustained during that process.

Sarah S., Benjamin S., and Rosetta S., the paternal grandmother, all testified about Sophia's propensity to climb. Specifically, Benjamin S. stated that he had observed Sophia climb from the commode to the vanity just one month before she was injured.

Detective Snuffer, one of the investigating police officers, also testified. He stated that Sarah S. was cooperative during the investigation and firm in her resolve that she did not intentionally harm her child. According to the police report, the police officers found standing water in the vent in the bathroom floor where the injury occurred; water-soaked bathroom rugs in the bathroom floor where the injury occurred; dry bathtubs, kitchen sink and master bathroom sink; a rapidly filling and slow draining bathroom sink where the injury occurred; and no drain stopper in the bathroom sink where the injury occurred. The officers concluded that Sarah S.'s claim that there was no intentional wrongdoing on her part was consistent with the evidence they found during their investigation. As previously noted, no criminal charges were filed against Sarah S.

Full evidentiary adjudicatory hearings were held on March 5, 2009, and May 11,

2009. On June 24, 2009, the Court entered an adjudicatory order finding by clear and convincing evidence that Sarah S. did not intentionally inflict physical or emotional harm upon any of the minor children, particularly Sophia. The circuit court further found, however, that Sarah S. had neglected the children, particularly Sophia, by her own admission, because she was outside the family home when Sophia was injured. Thus, the circuit court concluded that Sarah S. was an "abusing parent" within the meaning of W. Va.Code § 49–1–3(b) (2007) (Repl.Vol.2009).[9]

The disposition hearing was held on June 24, 2009. Both the DHHR and the guardian ad litem moved for the termination of Sarah S.'s parental rights. Sarah S. requested an improvement period. The court concluded that there were no statutory grounds for terminating Sarah S.'s parental rights and that she "ha[d] demonstrated through her acceptance of responsibility for neglect of the minor child an adequate capacity to solve the problems of neglect with a reasonable likelihood that the conditions of neglect which led to the filing of the petition in this action can be corrected substantially in the near future." *See* W. Va.Code § 49–6–5 (2006) (Repl.Vol.2009). The circuit court further found that Sarah S. had demonstrated, by clear and convincing evidence, that she is likely to fully participate in an improvement period. *See* W. Va.Code § 49–6–12(b)(2) (1996) (Repl.Vol.2009). Accordingly, the court granted Sarah S. a six-month dispositional improvement period. The court directed the DHHR to develop a plan of improvement to begin reunification of the minor children with their parents. The final order was entered on July 30, 2009, and this appeal followed.[10]

## II.

### STANDARD OF REVIEW

■ "For appeals resulting from abuse and neglect proceedings, such as the case *sub judice*, we employ a compound standard of review: conclusions of law are subject to a *de novo* review, while findings of fact are weighed against a clearly erroneous standard." *In re Emily*, 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). In other words,

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syllabus Point 1, *In the Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996). With these standards in mind, the issue presented in this case will be considered.

## III.

### DISCUSSION

■ As noted above, the guardian ad litem contends in this appeal that the circuit court erred by not terminating Sarah S.'s parental rights. The guardian maintains that the evidence clearly establishes that Sophia sustained second-degree burns as a result of

---

9. W. Va.Code § 49–1–3(b) states:
 "Abusing parent" means a parent, guardian or other custodian, regardless of his or her age, whose conduct, as alleged in the petition charging child abuse or neglect, has been adjudged by the court to constitute child abuse or neglect.

10. The DHHR did not file a brief in this appeal, but did submit a one-page letter stating that it supports the position and relief requested by the guardian ad litem. Teddy C. and Benjamin S. did not participate in this appeal.

intentional immersion in scalding water. The guardian asserts that the expert testimony of the two physicians who treated Sophia at the Burn Center at the Cabell Huntington Hospital, as well as the medical records from Nationwide Children's Hospital, indicate that Sophia was held down in the water, but managed to lift one foot in her efforts to fight off the assault resulting in non-symmetrical, but circumferential, injuries to her legs—a "classic stocking and/or glove" severe burn injury. In addition, the experts testified that the fact that Sophia suffered very few burns to her upper legs and perineum area was consistent with the dunking or immersion of the child in the sink as there would be minimal splashing. Finally, the experts stated that the unexplained long linear bruise on Sophia's right thigh was consistent with the force necessary to hold down a child in the scalding water. The guardian argues that the circuit court erred by ignoring this overwhelming medical evidence which established that Sophia's injuries were not the result of an accident and elevating the opinion of Mr. Porter, a physician assistant, over the well-reasoned opinions of highly trained medical doctors.

In response, Sarah S. argues that the circuit court did not err by concluding that she did not intentionally harm her child and refusing to terminate her parental rights. Sarah S. contends that the guardian's argument is based upon theories and scenarios of how Sophia was injured instead of actual evidence. Sarah S. maintains that the evidence shows that Sophia accidentally burned herself. In that regard, she first points out the Kanawha County Sheriff's Department conducted a thorough investigation and concluded that the evidence was consistent with her explanation of what happened to Sophia. The investigating officers took digital photographs of the interior and exterior of the residence. They checked all sinks and bathtubs. They turned on the hot water and let it run for a few seconds at which time the water became hot. They measured the temperature of the water with a thermometer. They noted that the bathtubs were dry. They measured the depth of the bathtub, the height of the vanity, the diameter of the sink, and checked the hot water tank, noting that it was covered with cobwebs indicative that it had not been disturbed. They also noted that the sink where the injury occurred filled rapidly, drained slowly, and had strong water pressure. The water was unable to drain without filling the sink rapidly. The police concluded that Sarah S.'s statement that Sophia's injury was an accident was consistent with the evidence.

In addition to the police report, Sarah S. notes that the circuit court had evidence in the form of testimony from Rosetta S., the paternal grandmother, that Sophia had sat on her bathroom vanity just two weeks before the accident to wash her hands and asked to put her feet in the sink. In addition, Sophia's father, Benjamin S., testified that a month before the accident, he observed Sophia climbing onto the vanity where the accident occurred.

Finally, Sarah S. claims that the testimony provided by her medical expert, Mr. Porter, establishes that Sophia was not intentionally burned. She first points out that unlike DHHR's expert physicians who based their testimony solely upon their observations and treatment of Sophia S. at Cabell Huntington Hospital,[11] Mr. Porter reviewed Sophia's medical records from both hospitals. In addition, he consulted publications by the U.S. Department of Justice, as well as medical texts, regarding burn victims and classic findings in abuse and neglect cases. During his testimony, Mr. Porter provided a list of ten factors that are utilized by medical professionals to assess whether or not a burn injury is intentional or accidental. Those factors are as follows: the presence of glove and stocking appearance; the uniformity of depth of the burn; symmetry of the water line; the presence or absence of splash injuries; the sparing of skin; other injuries including bruises and old and new fractures; the ability of the child to climb; cognitive skills of the child; the location in the home where the injury occurred; and previous abuse and neglect of the child. When Mr.

11. Both Dr. Pino and Dr. Henchman testified that they had not reviewed Sophia's medical records from the Nationwide's Children Hospital in Columbus, Ohio.

Porter considered the factors along with Sophia's medical records, he concluded that Sophia accidentally burned herself.

With regard to splash injuries, Mr. Porter testified that in the traditional abuse and neglect case where a child was forcibly held down in scalding water, there would be no splash injuries. He stated that Sophia's medical records showed that she had a few splash injuries on her upper legs, one in the perineum area, and one on her lower back. He testified that this evidence indicated that Sophia was trying to remove herself from the water and that she did not have any external force applied to her. He also opined that the linear bruise on one of Sophia's upper legs was most likely obtained by falling against a surface such as a straight edge. He explained that if a child is held down in water, there are typically hand or thumb prints on the child; Sophia had no such injuries, nor was there any evidence that she had ever been physically abused.

Sarah S. acknowledges that she was negligent in the supervision of her child. However, she maintains that the evidence outlined above shows that she did not intentionally harm Sophia. Therefore, she asserts that circuit court did not err by granting her a six-month improvement period and refusing to terminate her parental rights.

 As noted in the preceding standard of review section of this opinion, this Court should not overturn the findings of the circuit court in an abuse and neglect proceeding "simply because [we] would have decided the case differently, and [we] must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus Point 1, *Tiffany Marie S.*, *supra*. Under Rule 52(a) of the West Virginia Rules of Civil Procedure, "[i]n all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous[.]" Furthermore, "due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."

*Id.* Accordingly, this Court has observed that

> [w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings.... Deference is appropriate because the trial judge was on the spot and is better able than an appellate court to decide whether the error affected substantial rights of the parties.

*Id.* at 231, 470 S.E.2d at 185 (citation and internal quotation omitted). Finally, this Court has explained that

> [d]etermining whether a parent or guardian has neglected or abused his or her children, like most adversarial-oriented explorations, is a predominantly factbound enterprise. It follows that, absent a mistake of law, an appellate tribunal should disturb a circuit court's determination only if it is clearly erroneous. This means, of course, that if there are two or more plausible interpretations of the evidence, the circuit court's choice among them must hold sway.

*Id.* at 237, 470 S.E.2d at 191.

This is an extremely close and difficult case. The circuit court was presented with two plausible interpretations of the evidence and acting as the finder of fact, determined that Sarah S. "did not intentionally inflict physical or emotional harm upon any of the minor children and more specifically, the minor child, [Sophia]." The circuit court did find, however, that Sarah S. was negligent in failing to supervise Sophia resulting in her being physically injured and that such action constituted neglect warranting a six-month dispositional improvement period. Having carefully examined the record in this case, this Court does not find the circuit court's findings of fact to be clearly erroneous. The circuit court had before it sufficient evidence to support its determination, and this Court is not left with a definite and firm conviction that a mistake has been committed.

 While this Court finds no clear error and affirms the decision of the circuit court, we once again believe it is necessary to stress the importance of a promptly prepared

case plan aimed at providing a meaningful improvement period and reunification of the family. *See In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996). "Under W.Va. Code, 49–6–2(b) [ (2006) (Repl.Vol.2009) ], when an improvement period is authorized, then the court by order shall require the Department of Human Services to prepare a family case plan pursuant to W.Va.Code, 49–6D–3 [ (1998) (Repl.Vol.2009) ]." Syllabus Point 3, *State ex rel. W.Va. Dept. of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

In formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multi-disciplinary effort among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family.

Syllabus Point 4, *In the Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). This is especially important in a case such as this where ensuring a child's safety is so vital.

The record in this case indicates that the only service that the DHHR provided to Sarah S. during the course of the proceedings below was supervised visits.[12] Also, the permanency plan filed by the DHHR prior to the disposition hearing contemplated termination of parental rights. Obviously, in light of our decision, the permanency plan must be revised and an improvement period plan formulated. At the outset of the improvement

period, the circuit court has an obligation to facilitate communication between the parties to ensure Sarah S. and the DHHR are aware of what is expected during the improvement period. *Carlita B.*, 185 W.Va. at 625–26 n. 15, 408 S.E.2d at 377–78 n. 15. The parties should make the court aware of any foreseen obstacles that would prevent compliance with the parenting plan so that they may be resolved prior to commencement of the improvement period. *Id.* Most importantly, however, the court should make sure that the children have been informed of the changes that are about to occur in their lives[13] and that they are receiving counseling or any other services that are necessary to achieve stability in their lives. *Id.*

While the circuit court found that Sophia may not have been intentionally harmed, the fact remains that she suffered very serious injuries because a lack of parental supervision. Clearly, services should be devised to address the conditions of neglect that resulted in Sophia's injuries. Furthermore, during the improvement period, the circuit court should monitor the status of the children and the progress of Sarah S. in satisfying the goals of the parenting plan on a monthly basis. *See Carlita B.*, 185 W. Va. at 625, 408 S.E.2d at 377 (establishing monthly reviews to monitor improvement periods).[14] At such monthly reviews, the parties, attorneys, and social workers should appear before the court so that Sarah S.'s progress can be closely monitored to ensure compliance with the conditions of the improvement period, and a record of such proceedings should be made and filed.

At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and

**12.** Apparently, Sarah S. did participate in parenting classes provided by Children First, the agency that supervised her visits with her children. Two employees of the agency testified during proceedings below that Sarah S. had been compliant with all services, demonstrated positive behaviors with her children, and applied the parenting suggestions learned in parenting classes during her supervised visits.

**13.** The children have only had supervised visits with their mother for the past year and a half.

**14.** As noted in *Carlita B.*, the circuit court should make sure that the parent has transportation to attend the monthly reviews and any program that is a condition of the improvements period, and if not, direct the DHHR to assist with transportation. Also, the monthly reviews and programs should be scheduled so that they do not interfere with the parent's employment. 185 W.Va. at 625–26 n. 15, 408 S.E.2d at 377–78 n. 15.

shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child[ren].

Syllabus Point 6, *Carlita B.*

## IV.

## CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Kanawha County entered on July 20, 2009, is affirmed, and this case is remanded to the circuit court with directions regarding the improvement period as set forth herein.

Affirmed and remanded with directions.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

BENJAMIN, J., dissenting.

I dissent from the majority opinion. Based upon my review of the record, I conclude that the circuit court's findings were not supported by the credible evidence of record and that such findings were clearly erroneous when the record is viewed as a whole. It is not often that I do not defer to the trial court in such matters and these certainly are difficult cases, but here I believe the conclusion that this young child scalded herself is inconsistent with the facts of the record and the opinions of Sophia S.'s treating physicians. Sophia S. received second-degree scalding-type burns to her feet and legs. Her mother contended that these burns were the result of an accidental immersion, as opposed to an intentional act on the part of her mother.[1] On appeal, I believe my colleagues fail to give sufficient weight to the medical opinions of the two treating emergency room physicians as well as that from the medical personnel treating the child

at a specialized out-of-state burn clinic which supported the conclusion that Sophia S.'s burns were the result of the mother's intentional act.

The circuit court's findings of fact on this issue were based upon the opinion testimony of Greg Porter, a physician's assistant, who was hired by the mother to review medical records and to provide expert testimony. Mr. Porter was not involved in the treatment of this child. The State and the guardian *ad litem* relied upon the expert medical testimony of two treating physicians at the Cabell Huntington Hospital Burn Center, Eduardo Pino, M.D., and David Henchman, M.D. The State and the guardian *ad litem* also relied upon the medical opinion, by way of statement, of Gail E. Besner, M.D., Sophia S.'s treating physician at Nationwide Children's Hospital, a nationally-recognized children's medical facility in Columbus, Ohio. The combined expert opinions of Drs. Pino, Henchman and Besner concluded that Sophia S.'s immersion burns were the result of an intentional act by the mother. The opinions of these medical doctors was based upon years of experience with the treatment of burns on an emergency basis and upon their actual examination of Sophia S.

We have held that "[i]n determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications, (b) in a field that is relevant to the subject under investigation, and (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify. *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995). If one accepts for the moment that the physician's assistant was competent herein to give medical opinion testimony regarding causation,[2] the role of the circuit court as

---

1. There is no dispute that the child's mother was the sole adult individual present at the time the child's feet and legs were burned. The mother presented a defense that the twenty-two month old child climbed up onto the bathroom sink, turned on the hot water and placed her feet and legs into the scalding water and held them there. The mother was on the phone at the time of this incident, immediately outside of the family's liv-

ing quarters, where she had to go to get a usable signal on her cell phone.

2. I believe it appropriate at some point for this Court to visit the evidentiary issue of the minimum standards of competency which should be present where a given witness seeks to render opinion testimony of a certain nature. A physician assistant certainly has more training of a

the fact-finder in this abuse and neglect proceeding was to assess and weigh the differences between the treating medical doctors' evidence and that of the retained physician's assistant. Based not only upon the overwhelming difference in expertise and experience of these witnesses, but also on the manner in which Sophie S. was burned, I believe that the circuit court failed to give sufficient weight to the opinions of the treating medical doctors. As the majority correctly notes, our standard of review of the findings and conclusions of the circuit court is deferential.

Moreover, these are admittedly difficult cases for all involved. Here, however, when the record is reviewed as a whole, I believe the findings of the circuit court on the accidental nature of the child's burns to be clearly erroneous.

---

medical nature than does a laborer, yet that training and experience is far different from that of a medical doctor. At what point should our judicial system permit or prohibit non-physicians with some level of medical expertise (such as physician assistants, nurses, nurse practitioners, and emergency medical response personnel) from rendering opinion testimony of a medical causation nature? This question carries over to other areas of expertise. I believe it appropriate for us to revisit these basic gate-keeping matters.