# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **D.J. and L.J.**

**No. 19-0388** (Raleigh County 17-JA-259, 17-JA-260)

**FILED**
**June 16, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioner H.J.[1] appeals from the "Order Following March 12, 2019, Dispositional Hearing" that was entered by the Circuit Court of Raleigh County on March 22, 2019. In that order, the circuit court terminated the petitioner's custodial rights to her son D.J and her parental rights to her daughter L.J. The petitioner argues that the circuit court erred by terminating these rights without allowing her to present testimony from a substance abuse treatment counselor, and without holding the record open to accept testimony from her mother. The respondents in this appeal are the Department of Health and Human Resources ("DHHR"), the children's guardian *ad litem*, and the intervenors J.S.C. and W.J. who are L.J.'s foster parents. All of the respondents argue in support of the circuit court's termination order.[2]

After considering the parties' written and oral arguments, as well as the record on appeal and the applicable law, this Court finds no substantial question of law and no reversible error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

## I. Facts and Procedural Background

The petitioner is the mother of D.J., who was born in 2002, and L.J., who was born in 2014.[3] The DHHR initiated this abuse and neglect case by filing a petition in circuit court in October 2017. The petition included multiple allegations against the petitioner including that she had a history of drug addiction; she overdosed on heroin in September 2017, requiring the

---

[1] Because this case involves minors and sensitive matters, we follow our longstanding practice of using initials to refer to the children and the petitioner. *See, e.g.*, W.Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] The petitioner is represented by Steven K. Mancini, Esq. The DHHR is represented by Patrick Morrisey, Attorney General, and Brandolyn N. Felton-Ernest, Assistant Attorney General. The children's guardian *ad litem* is P. Michael Magann, Esq. The intervenors J.S.C. and W.J. are represented by Mary Beth Chapman, Esq.

[3] The children have different fathers who did not live with them or provide them with care. The fathers' parental rights were terminated in the course of this abuse and neglect case. However, this appeal only pertains to the mother's rights.

1

administration of two cans of Narcan to revive her; she admitted using marijuana and Suboxone that she bought off the street; she was not attentive to the children, and D.J. was often forced to be the primary caregiver for L.J.; D.J. went to school dirty and disheveled, had to shower at school, and slept during his classes; D.J. had a history of truancy, including missing twelve consecutive, unexcused days from school; when D.J. recently missed the school bus, the petitioner sent him walking to school in the rain for three to four miles along a busy highway; the petitioner and the children lacked a permanent home and were moving from place to place; the residence where they were staying at the time was dirty and contained no food except one small package of bologna; and D.J. had uncontrolled type 1 diabetes and missed thirty percent of the appointments with his endocrinologist. By order entered October 12, 2017, the circuit court removed the children from the petitioner's care, placed them in the legal custody of the DHHR, and appointed a lawyer for the petitioner and a guardian *ad litem* for the children.

In November 2017, the DHHR filed two amended abuse and neglect petitions to add further allegations against the mother.[4] After the children were removed from the petitioner's care, D.J. disclosed to Child Protective Service ("CPS") workers that the petitioner would go to her friends' homes to "get high"; she would leave the children with their sick grandmother and not come back for days; she gave D.J. permission to smoke marijuana as long as he "didn't touch anything else"; and she smoked marijuana with D.J. on one occasion. D.J. revealed that he helped his mother find Suboxone and "whatever else she needed" from friends so that she could use the drugs and not get sick. D.J. knocked on doors and sold or traded his personal belongings to get drugs for his mother. Moreover, D.J. reported that an uncle and cousin with whom they were living at the time of removal had sold marijuana from the home and had given D.J. marijuana to sell.

The appendix record indicates that the CPS also had prior involvement with this family, although that prior involvement had not resulted in the filing of an abuse and neglect petition. In June 2016, D.J. went into ketoacidosis because the petitioner was not administering the appropriate amounts of insulin to him. A CPS case was opened, and the petitioner was provided with services to educate her on how to care for D.J.'s diabetic needs, household management, and avoiding truancy. The petitioner completed the treatment plan and that case was closed in May 2017, just five months before the current abuse and neglect case was opened.

An initial adjudicatory hearing regarding the allegations in the October abuse and neglect petition was held on December 19, 2017. The petitioner did not appear, but was represented by counsel. The DHHR presented evidence regarding the allegations.

While this case was pending, the petitioner overdosed on drugs again. In January 2018, she was found unconscious at a convenience store with a hypodermic needle stuck in her arm and heroin in her purse. As a result, she was incarcerated for several days.

Another adjudicatory hearing was held on February 27, 2018. The petitioner mother was not present for the hearing, but through her counsel she offered to stipulate to medical neglect, drug abuse which resulted in abuse and neglect, and failure to supervise the children which resulted

---

[4] These amended petitions also included allegations against the children's fathers, but those allegations are not at issue in this appeal.

in truancy. The circuit court accepted the oral stipulation, subject to a written stipulation also being filed, and adjudicated the petitioner as having abused and/or neglected the children. The petitioner's counsel moved for a six-month post-adjudicatory improvement period, which the court granted. In the mother's written stipulation that was filed on March 15, 2018, she admitted neglecting the proper daily care of the children as the result of her substance abuse, neglecting D.J.'s medical care, and neglecting D.J. by failing to address his truancy.

A meeting of the Multidisciplinary Treatment Team ("MDT") was held on March 15, 2018, to formulate a plan for the petitioner's improvement period. The petitioner participated by telephone, while her counsel was present in person. After discussion, the MDT identified three deficiencies and formulated a case treatment plan to remedy these problems. First, they determined that the petitioner's "drug and/or alcohol use is pervasive and threatens child safety." To remedy this, the petitioner and all members of the MDT agreed as follows:

> [Petitioner] will attend an MDT approved 6 to 12-month inpatient drug treatment program. [Petitioner] will follow the inpatient program treatment plan and get clean of all illegal substances and Suboxone, methadone, and naloxone. If [petitioner] miss[es] drug screens, tests positive for drugs that are not prescribed, is not learning anything from classes, miss[es] any classes or counseling sessions, the department may file a motion to terminate the improvement period. [Petitioner] will not jump from program to program, if [petitioner] is discharged from a program she has one month to get enrolled into another program or the Department will file a motion to terminate the Improvement Period. Upon completing the inpatient Drug treatment program [petitioner] will screen at Day Report to make sure that she is continuing to maintain sobriety.

CPS Worker Mark Ward has explained that the inpatient treatment requirement was "so strict" because of the need to address the petitioner's severe and significant history of drug abuse. The petitioner has testified that she agreed to long-term inpatient treatment because she knew she had to remove herself from the environment where she was receiving drugs. She explained that she was living in a trailer park with her brother where "you can go to every other trailer and get anything you want."[5]

Second, the MDT determined that the petitioner "is unwilling or unable to perform parental duties and responsibilities, which could result in serious harm to the child." To remedy this, the MDT wrote in the case plan that

> [petitioner] will maintain a stable and sanitary home free of illegal drugs, drug paraphernalia, clutter, dangerous objects that threaten[] the child's safety, [and] persons with a criminal history that could

---

[5] Mr. Ward and the petitioner provided this testimony about the inpatient drug treatment requirement during the March 2019 dispositional hearing.

3

set [her] back in her sobriety. [Petitioner] will maintain the utilities and rent on the house. Upon completing the inpatient program [petitioner] will work with a provider on Adult Life Skills, Budgeting, Parenting, and cleanliness. The Parenting will consist of the impact that [petitioner's] drug abuse has had on [D.J.] and [L.J.].

Third, the MDT determined that the petitioner lacked "parenting knowledge[,] skills, or motivation" that affected child safety. To address this problem, they agreed as follows:

[Petitioner] knows the importance of medical care for each of her children and this includes but [is] not limited to a pediatrician, eye and dental. [Petitioner] will participate in parenting classes to know how medical neglect can have a long-lasting effect on her children. [Petitioner] knows what each aspect of medical care is needed for a child throughout the development of the child and document [sic] it in the[] parenting classes. [Petitioner][,] when deemed appropriate[,] will attend each medical appointment of each child then discuss with their parenting ASO provider what they learned and how this affects the[] child's development. . . .

Later that same day, the petitioner personally signed the treatment plan, indicating her agreement to its terms.[6]

The circuit court held a mid-point review hearing on the petitioner's improvement period on May 15, 2018. The petitioner did not attend, although she had been informed of the hearing date during the March MDT meeting. The court was informed that the petitioner was not progressing in her improvement period, had not enrolled in an inpatient drug treatment program, was not attending drug screens, and was missing many of the visits with her children. The petitioner's counsel represented that his client was trying to be admitted into an inpatient treatment program, but he did not have documentation to confirm this.

The circuit court held a final improvement period review hearing on August 14, 2018. The petitioner was not present, but was reportedly on her way. The lawyers and parties who were present agreed to hold a dispositional hearing on November 13, 2018, and the review hearing was concluded. However, the November dispositional hearing was canceled due to the hospitalization of the petitioner's counsel. Another MDT meeting was held on December 14, 2018, but both the petitioner and her lawyer missed the meeting due to a calendaring mistake by counsel.

Although her six-month improvement period had already expired, on January 15, 2019, the petitioner filed a "Motion for Extension to Post-Adjudication Improvement Period or [Motion for] Dispositional Improvement Period." In this motion, the petitioner revealed for the first time that

[6] There are actually two treatment plan documents, one written for each child, but the plans are identical. The petitioner participated in the MDT meeting by telephone, but the petitioner's counsel represents that he took the plan documents to the petitioner and obtained her signature that same day.

in June 2018 she had enrolled for outpatient methadone treatments at the Beckley Comprehensive Treatment Center. Although her written case plan did not allow this course of treatment, the petitioner had not asked the MDT to change the plan, and she had not filed any motion with the circuit court to modify the terms of her improvement period.

The dispositional hearing was rescheduled for January 15, 2019, but that date was canceled because the petitioner was hospitalized for cardiac and other medical issues. A dispositional hearing was finally held on March 12, 2019.

During the dispositional hearing, the DHHR presented testimony from its CPS Worker, Mr. Ward, about the treatment plan that the petitioner had agreed to follow in order to regain custody of her children. Mr. Ward explained that the petitioner failed to complete any of the three goals set forth in her treatment plan: attendance at a six- to twelve-month inpatient drug treatment program approved by the MDT; obtaining a sanitary and stable home for the children; and understanding the importance of medical care for the children. Although the petitioner had recently disclosed that she was receiving treatment at a methadone clinic, Mr. Ward noted that the treatment plan expressly prohibited her from using Suboxone, methadone, or Naloxone. Mr. Ward reported that while L.J. was doing well in her foster care placement, D.J. was having troubles including a suspension from school for drinking alcohol. D.J. is also known to talk about gangs and drugs, which resulted in Mr. Ward recommending that there be no sibling visitation between D.J. and L.J.

Furthermore, James Miller, the director of the Raleigh County Day Report Center, testified that parents facing drug-related abuse and neglect charges are usually administered drug tests two times a week at the Day Report Center. During the pendency of this case, the petitioner reported to the Day Report Center for drug testing a total of just three times. On December 5, 2017, she tested positive for methamphetamine, amphetamine, marijuana, buprenorphine, norburprenorphine, morphine, temazapam, and oxazepam. She tested negative for any drugs in February 2018, and on January 2, 2019, she tested positive for methadone and methadone metabolite. Mr. Miller testified that the petitioner missed a total of forty-eight drug screens at the Day Report Center.

The DHHR also presented testimony about the petitioner's visitation with her children during the pendency of the case. She was permitted two-hour supervised visits every week. Amber Stewart was a service provider hired to transport the petitioner and the children to the visits, as well as to provide the supervision. Ms. Stewart testified that visits between the petitioner and L.J. occurred on November 16, 20, and 27, 2017, and visits between the petitioner and both children took place on December 5 and 18, 2017.[7] Ms. Stewart testified that the petitioner did not bring snacks for the children, had to be reminded to stay off of her cell phone and pay attention to L.J., ended the November 20 visitation one hour early, and had to go to the bathroom to vomit during each of the first four visits. Ms. Stewart testified that during the December 5 visitation, D.J. cried and hung on his mother but the petitioner did not attempt to console him, while L.J. was left to play on the floor without interacting with the petitioner or D.J.

---

[7] D.J. did not attend the first few visits because he was hospitalized due to his diabetes.

The last time the petitioner saw either of her children was during a supervised visit on December 18, 2017. Although Ms. Stewart felt that the visit went well, a few days later she learned that D.J. was found in the possession of marijuana and told his foster parent that the petitioner had given him the drugs. All visitation between the petitioner and children was temporarily halted, and Ms. Stewart was no longer permitted to transport the petitioner because the petitioner had apparently carried these drugs in Ms. Stewart's car.

Ms. Stewart testified that in March 2018, CPS permitted her to resume arranging visits between the petitioner and L.J. According to Ms. Stewart, she scheduled eight visits for the petitioner and L.J. between March and May 2018, but they were all canceled. One was canceled by L.J.'s foster parent because the child was ill. One visit set for April 27 was canceled because the petitioner apparently lacked transportation; she told Ms. Stewart that the ball joint on her sister's car was being repaired that morning. The remaining six visits were canceled by the petitioner because she was sick, had overslept, or because the petitioner failed to call and confirm that she would attend the planned visit. After these several failed attempts, the CPS instructed Ms. Stewart to stop trying to arrange visits. CPS Worker Mr. Ward testified that the petitioner never contacted him to inquire about her children, to request visitation or telephone calls with her children, or to request transportation for visitation or for drug screens.

Mr. Ward reported that the children had been in the foster care system for more than fifteen of the preceding twenty-two months.[8] In his opinion, there was no reasonable belief that allowing the petitioner extra time to complete an improvement period would result in completing the goals of the case plan. The DHHR therefore recommended that the Court terminate the petitioner's parental rights. The children's guardian *ad litem* concurred with Mr. Ward's assessment and asked that parental rights to L.J. be terminated. However, the guardian *ad litem* reported that the sixteen-year-old D.J. wished for his mother's parental rights to remain intact.[9]

---

[8] West Virginia Code § 49-4-605(a)(1) (2018) requires the DHHR to

> file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights: (1) If a child has been in foster care for 15 of the most recent 22 months as determined by the earlier of the date of the first judicial finding that the child is subjected to abuse or neglect or the date which is 60 days after the child is removed from the home[.]

Exceptions to this provision are not applicable here. *Accord* W.Va. Code § 49-4-610(9) (2015) (prohibiting court from granting improvement period that may cause child to be in foster care more than fifteen of most recent twenty-two months absent compelling circumstances).

[9] West Virginia Code § 49-4-604(b)(6)(C) (2019) directs that "[n]otwithstanding any other provision of this article, the court shall give consideration to the wishes of a child 14 years of age or older or otherwise of an age of discretion as determined by the court regarding the permanent termination of parental rights." Although the Legislature amended West Virginia Code § 49-4-604 effective June 5, 2020, including renumbering the provisions, the amendments do not impact this case.

During the dispositional hearing the petitioner testified that she did not go to inpatient drug treatment because she needed to care for her mother who had "come out of" a nursing home. She explained that since June 27, 2018, she had received drug counseling and daily methadone treatments on an outpatient basis from the Beckley Comprehensive Treatment Center, and that she was doing well on her road to recovery. She reported that she underwent random drug tests from the methadone clinic which were mostly clean. The reports of her drug screens at the clinic, which were provided to the DHHR and the guardian *ad litem*, showed that she tested positive for methamphetamines on October 31, 2018. These test results also showed that she had marijuana in her system throughout the summer of 2018, in December 2018, and in January 2019.

In her testimony at the dispositional hearing, the petitioner denied giving D.J. marijuana during the December 2017 visit and blamed a lack of DHHR-provided transportation for her failure to visit the children at other times. The petitioner testified that she made regular attempts to call L.J. on the telephone, but her calls were not answered. The petitioner admitted that she never contacted CPS Worker Mr. Ward about the children, visitation, or telephone calls. Moreover, she never filed any motion with the circuit court seeking an order to re-establish visitation, DHHR-provided transportation, or telephone calls. Finally, the petitioner testified that she was living with a roommate, M.C., and did not have her own residence.

At approximately 2:00 p.m. on the day before the March 12, 2019, dispositional hearing, the petitioner disclosed that she intended to call three witnesses to testify at the hearing: Brandy Saddler, her drug counselor at the Beckley Comprehensive Treatment Center; D.B., her mother; and M.C., her roommate. On the day of the hearing, however, the petitioner did not seek to present any testimony from her roommate. Moreover, the petitioner's mother was unavailable to testify because she was hospitalized, so the petitioner's counsel asked that the record be kept open for supplementation with her mother's testimony. The DHHR objected to the testimony of Ms. Saddler and the petitioner's mother, arguing that these witnesses were untimely disclosed and that their testimony would be irrelevant to the question of whether the petitioner had complied with her case plan. The circuit court delayed a ruling on this evidence until the end of the hearing. Ultimately, the circuit court accepted as true the fact that the petitioner had been receiving methadone treatments, but excluded Ms. Saddler's testimony as not relevant to the question of whether the petitioner had complied with her MDT-approved case plan. The circuit court was also concerned that achieving success with the methadone treatments would require many more months of treatments but D.J. and L.J. had already been in foster care for seventeen months. With regard to the petitioner's mother, the circuit court accepted the proffer of the petitioner's counsel that she would testify that the petitioner has been enrolled in a methadone program and is now sober and able to care for her and the children. However, the Court found that it was unnecessary to hear this testimony in person and declined to hold the disposition in abeyance.[10]

After considering the testimony, the proffers of the petitioner's counsel, and the arguments of counsel, the circuit court denied the petitioner's motion for an additional improvement period

---

[10] The petitioner's mother has since died.

and ordered the termination of her parental rights to L.J. and her custodial right to D.J.[11] In a thirty-one page order entered on March 22, 2019, the court found, *inter alia*, that the petitioner failed to comply with the requirements of her case plan and demonstrated an inadequate capacity to solve the problems of abuse or neglect. The court found no reasonable likelihood that the conditions of abuse or neglect could be substantially corrected in the near future and that reunification with the petitioner would not be in the children's best interests. Moreover, the children needed continuity of care and dependable caretakers and had already been out of the home for seventeen months. This is the order from which the petitioner appeals.[12]

## II. Standard of Review

This Court has established the following standard of appellate review for abuse and neglect cases:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety. Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). The petitioner assigns error regarding the circuit court's exclusion of certain testimony, which we examine for abuse of

---

[11] The decision to terminate only her custodial rights to the sixteen-year-old D.J. was based upon D.J.'s stated preference, which the circuit court was required to consider pursuant to West Virginia Code § 49-4-604(b)(6)(C) (2019). *See supra* n. 9.

[12] In April 2020 the parties filed updates on the children's status pursuant to Rule 11(j) of the Rules of Appellate Procedure. Because some of the information provided in these updates was not available to the circuit court, we will not use it as a basis for our decision. However, of particular concern to this Court is a report from the DHHR that D.J., who will turn eighteen years old later this year, has periodically been refusing meals in order to shrink his stomach to return home to his mother where he believes there will be less food available. This causes complications for his diabetes. We direct the DHHR and the guardian *ad litem* to ensure that D.J. is currently receiving all medical services he needs, including mental health services, and to encourage D.J. to participate in the services available to young adults when they age out of the foster care system.

discretion: "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 61, 511 S.E.2d 469 (1998).

Finally, our consideration of every abuse and neglect case must ultimately be guided by the best interests of the children. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). With these principles in mind, we turn to the parties' arguments.

### III. Discussion

On appeal, the petitioner argues that the circuit court erred in terminating her parental rights to L.J. and her custodial rights to D.J. without allowing her to call Ms. Saddler as a witness at the dispositional hearing and without holding the record open for her mother's testimony.

The circuit court excluded Ms. Saddler's testimony about the outpatient care administered at the Beckley Comprehensive Treatment Center upon finding that it would be wholly irrelevant to the question of whether the petitioner had complied with the terms of her post-adjudicatory improvement period as set forth in the agreed case plan. This Court has held that

> "[a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child[ren]." Syllabus Point 6, *In the Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

Syl. Pt. 4, *In re Faith C.*, 226 W.Va. 188, 699 S.E.2d 730 (2010). We agree that Ms. Saddler's testimony would be irrelevant to the question of whether the petitioner complied with her case plan, inasmuch as the plan required inpatient substance abuse treatment and expressly prohibited the use of methadone. Notably, the petitioner consented to the terms of the case plan and, as time progressed, never asked the MDT or the circuit court to alter the requirements. Both the petitioner and her lawyer were members of the MDT and could have sought a modification of the plan from either the MDT or the circuit court. *See* W.Va. Code §§ 49-4-404(c) (2015), 49-4-405(b) (2015). Instead, the petitioner embarked upon a different course and concealed her use of methadone from the DHHR and the other parties for six months.

Despite the petitioner's failure to follow the terms of her case plan and improvement period, she argues that Ms. Saddler's testimony would still be relevant to the ultimate issue of what disposition the circuit court should impose. This is a valid argument inasmuch as we have held that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best

interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W.Va. 57, 754 S.E.2d 743 (2014). Nonetheless, we conclude that the circuit court's evidentiary ruling was harmless error, if it was error at all. "Most errors, including constitutional ones are subject to harmless error analysis." *State ex rel. Waldron v. Scott*, 222 W.Va. 122, 126, 663 S.E.2d 576, 580 (2008) (citation omitted). The circuit court correctly decided this case based upon the best interests of the children.

We initially observe that these witnesses were disclosed in an untimely manner, late on the day prior to the dispositional hearing. Rule 30 of the Rules of Procedure for Child Abuse and Neglect Proceedings directs that "[a]t least five (5) judicial days prior to the disposition hearing, each party shall provide the other parties . . . and the court a list of possible witnesses, with a brief summary of the testimony to be presented[.]" The petitioner's untimely witness disclosure obviously would have hampered the ability of the other parties to prepare for the dispositional hearing.[13]

Importantly, the circuit court did not exclude all evidence of the petitioner's medication-assisted treatment. The court accepted as true the proffers by her counsel that the petitioner had been receiving methadone treatments. The court also accepted the proffer that the petitioner's mother would testify regarding these treatments and the petitioner's improvements. The petitioner herself was permitted to testify about the methadone treatments and the counseling provided by the Beckley Comprehensive Treatment Center, as well as her efforts and progress toward recovery. In addition, the results of the drug tests administered at the Beckley Comprehensive Treatment Center were used by the petitioner and all of the parties as part of the evidence in this case.

A theme underlying the petitioner's arguments seems to be that the DHHR and the circuit court are biased against the use of medication-assisted treatment for substance abuse. After oral argument, the petitioner submitted a notice of additional authority with a citation to West Virginia Code § 49-4-604(e) (2019) which provides that a court "may not terminate the parental right of a parent on the sole basis that the parent is participating in a medication-assisted treatment program, as regulated in [W.Va. Code] § 16-5Y-1 et seq., for substance use disorder, as long as the parent is successfully fulfilling his or her treatment obligations in the medication-assisted treatment program."[14] This Court expressly disapproves of any bias against medication-assisted treatment for substance abuse. However, as discussed below, the petitioner's use of methadone treatments was *not* the reason why her rights were properly terminated in this case. Moreover, when her case plan was developed, there were very good reasons to require inpatient care—including that one of the drugs petitioner was regularly abusing was Suboxone that she obtained off the street, including Suboxone that she had D.J. acquire for her. Her drug addiction was severe. She had overdosed on heroin twice, and in a single drug test administered at the Day Report Center in December 2017

---

[13] Although the untimeliness of the witness list was not a reason given by the circuit court for excluding Ms. Saddler's testimony and for refusing to hold the record open for the petitioner's mother's testimony, this Court may affirm for any reason apparent from the record. *See, e.g.*, Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965) ("This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment.").

[14] This provision was moved to West Virginia Code § 49-4-604(f) effective June 5, 2020.

she was positive for a long list of drugs: methamphetamine, amphetamine, marijuana, buprenorphine, norburprenorphine, morphine, temazapam, and oxazepam. When developing the case plan in March 2018, the MDT evaluated the situation and concluded that inpatient substance abuse treatment without the use of methadone or Suboxone was the best course of action to address the petitioner's severe addiction to multiple substances. In her testimony, the petitioner admitted that she agreed to attend inpatient treatment because she needed to escape the environment where she was surrounded by easily-accessible drugs. During the one and one-half years this case was pending in circuit court, the petitioner never asserted that methadone treatments would be appropriate and never asked the MDT or the circuit court for an alteration of the case plan. Thus, while we will not condone a bias against medication-assisted treatments, no bias has been shown from the facts of this case.

With regard to the petitioner's request to hold the record open for testimony from her mother, the dispositional hearing had already been continued twice, for a total of four months, at the request of the petitioner and her counsel. At that point in time, the children had been in foster care for seventeen months. It also appears that the petitioner could have elicited much the same evidence that her mother would have given if she had called her roommate to testify, but she did not. The circuit court accepted the petitioner's proffer of what her mother's testimony would be, and did not abuse its discretion when deciding that the disposition, and these children, should not wait any longer.

Most importantly, even if the circuit court had heard Ms. Saddler's and the petitioner's mother's testimony, it is clear to this Court that termination would still have been the proper outcome. West Virginia Code § 49-4-604(b)(6) (2019) directs a circuit court to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(c)(3) (2019) provides that a situation in which there is "[n]o reasonable likelihood that [the] conditions of neglect or abuse can be substantially corrected" includes when the abusing parent

> ha[s] not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health, or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare, or life of the child.

The petitioner, her lawyer, and the rest of the MDT designed a three-part case plan to address the petitioner's abusive and neglectful conduct. The plan required inpatient treatment for her severe addiction to drugs. The petitioner never attended or even sought inpatient drug treatment. She submitted to testing at the Day Report Center only three times. Even after she began methadone treatments in June 2018, the results of testing at the Beckley Comprehensive Treatment Center showed that the petitioner was still using methamphetamines in October 2018 and was using marijuana in 2018 and in January 2019. According to the guardian *ad litem*, who reviewed the drug test reports from the methadone clinic, nearly half of the petitioner's drug screens were positive for marijuana. Methamphetamines and marijuana are two of the drugs that the petitioner

was abusing when the children were in her care. Another requirement of the case plan was for the petitioner to obtain a sanitary and stable home for the children, but the circuit court found that she had failed to so. The case plan also required the petitioner to understand the importance of medical care for the children and to attend their medical appointments, but she never attended any of their appointments and never bothered to inquire of the DHHR about their health and well-being.

During the dispositional hearing, the petitioner blamed her failure to visit the children and her failure to take drug tests at the Day Report Center on the DHHR's withdrawal of transportation services in December 2017. However, these transportation services were only canceled when it was determined that the petitioner had carried marijuana to her teenaged son in the vehicle of a DHHR service provider. It is very telling that the petitioner never filed any motions with the circuit court challenging the DHHR's conclusion that she gave her son marijuana during the visit, and she never filed any motion with the court seeking the reinstatement of transportation services or visitation. Moreover, Ms. Stewart testified that of the visits she attempted to arrange between the petitioner and L.J. in 2018, the petitioner only blamed a lack of transportation for one of the seven visits that she failed to attend.

All of this evidence demonstrates that even if the petitioner is making some progress in her recovery through methadone treatments, there is still no reasonable likelihood that the petitioner can correct all of the conditions of abuse and neglect in the near future. As such, West Virginia Code § 49-4-604 required the circuit court to terminate the petitioner's rights to the children. For the foregoing reasons, the circuit court's March 22, 2019, dispositional order is affirmed.

Affirmed.

**ISSUED:  June 16, 2020**

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

**JENKINS, JUSTICE, CONCURRING AND WRITING SEPARATELY:**

This case presents yet another example of the opioid crisis that is rampant in the State of West Virginia and the devastating effects of addiction on our State's children.  I agree with the majority's decision that termination of the petitioner mother's parental rights is in the children's best interests in this case because they have suffered far too much and deserve a safe and secure permanent home.

However, I write separately because it became apparent during the oral arguments of this case that medication-assisted treatment programs often are viewed with disfavor when establishing family case plans and improvement periods designed to facilitate the reunification of these families

12

in crisis. Although I understand the service providers' belief that the mother's addiction was so severe that they viewed a medication-free treatment program as the only solution to ensuring her recovery, I do not believe that there is a single method by which an afflicted individual can overcome his or her addiction and achieve and maintain sobriety. Here, the mother claimed that, due to her familial obligations, she could not enter an inpatient treatment program as she had been directed to do because that would have left her mother without a caretaker. Although she informed various entities throughout the proceedings that she had entered an outpatient, medication-assisted treatment program and had complied with its requirements for nearly nine months, including making daily visits to the facility to receive her medication therapy, participating in counseling sessions, and submitting to drug screens, both the circuit court and this Court have found that this is not sufficient because she did not make the proper motion or request to change the terms of her required recovery program. Rather than chastising the mother for what may have been her counsel's shortcomings in ensuring the appropriate procedures had been followed to ratify this different course of treatment, we should instead acknowledge the mother's efforts to recognize her problems with addiction and make significant strides to overcome them. This is particularly true when the Legislature, itself, has forbidden the termination of parental rights to be based solely upon a parent's receipt of medication-assisted treatment to overcome addiction. *See* W. Va. Code § 49-4-604(e) ("The court may not terminate the parental right[s] of a parent on the sole basis that the parent is participating in a medication-assisted treatment program, as regulated in § 16-5Y-1 et seq., for substance use disorder, as long as the parent is successfully fulfilling his or her treatment obligations in the medication-assisted treatment program.").

Nevertheless, because the children's best interest is the determinative factor in the resolution of abuse and neglect proceedings, I concur in the majority's ultimate decision in this case.